**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 12-cv-01038-CMA-CBS (Consolidated for all purposes with
Civil Action No. 12-cv-01521-CMA-CBS)

PATIPAN NAKKHUMPUN, Individually and on behalf of all others similarly situated,

      Plaintiff,

v.

DANIEL J. TAYLOR,
JOHN R. WALLACE,
CARL E. LAKEY, and
KEVIN K. NANKE,

      Defendants.

---

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

---

In this class action, Lead Plaintiff Patipan Nakkhumpun, individually and on behalf of all others similarly situated, alleges that Defendants Daniel J. Taylor, John R. Wallace, Carl E. Lakey, and Kevin K. Nanke, former officers and directors of Delta Petroleum Corporation ("Delta" or "the Company"), committed various acts of securities fraud. The matter currently before the Court is Defendants' Motion to Dismiss Plaintiffs' Consolidated Complaint (the "Complaint"). (Doc. # 40.) For the reasons discussed below, the motion is granted.[1]

---

[1]     The Court, in its discretion under D.C.COLO.LCivR 7.1(G), determines that oral argument would not materially assist it in ruling on Defendants' motion. Thus, the Court declines Defendants' request to set the matter for argument. (Doc. # 40 at 1.)

# I. BACKGROUND

## A.    FACTS

### 1.    Delta and the Defendants

Delta was an oil and gas company founded in 1984, headquartered in Denver,

Colorado, and operating mainly in the Rocky Mountain and Gulf Coast regions.  (Doc.

# 36 at 7.)  In 2008 and 2009, Delta hired an investment banker to help it examine

strategic alternatives to reduce debt and improve liquidity.  (*Id.*)  In November 2009,

Delta announced that the alternatives under consideration included selling assets,

entering a partnership or joint venture, or selling the company.  (*Id.* at 8.)  From late

2009 through November 2011, Delta concentrated its efforts on its core asset in the

Vega Area of western Colorado's Piceance Basin.  (*Id.*)  During that period, the

Company sold many of its other assets so that by the end of 2010 the vast majority

of its proved reserves[2] and growth prospects lay in the Vega Area.  (*Id.*)

### 2.    The Opon Transaction

On March 18, 2010, Delta announced that it had entered into a "non-binding

letter of intent" with Opon International, LLC ("Opon" or "Opon International").  (*Id.* at

36.)  That letter of intent contemplated the sale of a 37.5% non-operated working

interest in Delta's Vega Area assets to Opon in exchange for $400 million.  (*Id.*)  In

addition, Opon would receive warrants to buy Delta stock on closing.  (*Id.*)  Delta's

announcement further described that the Company would put more than half the

proceeds to use developing the Vega Area assets with the remainder going to "balance

---

[2]       "Proved reserves" is a term often used in the petroleum industry to denote the
"estimated quantity of reasonably recoverable oil and gas in mineral properties."  *Truk Intern.
Fund LP v. Wehlmann*, 737 F. Supp. 2d 611, 615 (N.D. Tex. 2009) (footnote omitted).

sheet obligations and general working capital purposes." (*Id.*)  Finally, Delta noted that the letter of intent was "subject to customary due diligence, negotiation and execution of definitive binding agreements," and Opon's ability to arrange financing.  (*Id.* at 36-37.) Opon had until June 1, 2010, to finalize the transaction without competition.  (*Id.* at 37.)

Delta issued a press release on May 10, 2010, in which Defendant Wallace stated that Delta "continue[d] to work with [its] potential partner, Opon International, in moving toward the signing of definitive agreements and closing of the transaction."  (*Id.* at 38.)  That announcement reiterated all of the deal terms, including the interest in the assets and warrants Opon would receive and the $400 million price tag.  (*Id.*)   After describing those terms, the release again stated that "the parties [were] continuing with **the proposed transaction**" and that Delta "underst[ood] that Opon's financing efforts [were] ongoing."  (*Id.* (emphasis added).)  In an investor conference call the same day, Defendant Taylor again reiterated the deal terms and stated that Delta was "continu[ing] to work with Opon in their [*sic*] financing efforts and [was] working towards signing a definitive purchase and sale agreement."  (*Id.* at 40.)  He then declined to "comment specifically on the details of the proposed transaction" but said that Delta was "pleased" and that the "process [was] going well."  (*Id.*)

On June 1, 2010, the day Opon's exclusive negotiating period was to end, Delta issued another press release announcing an extension to the "expected time frame" to finalize the deal.  (*Id.* at 43.)  The Company once more reiterated its continuing efforts with Opon to secure financing and the ongoing work towards reaching a definitive agreement.  (*Id.*)  And once more, Delta restated the deal terms and the caveat that the deal was subject to negotiations, due diligence, and finalization.  (*Id.*)

Then, on July 7, 2010, Delta issued a press release announcing that it had "terminated discussions to sign a definitive Purchase and Sale Agreement with Opon" to sell the 37.5% stake in the Vega Area assets.  (*Id.* at 44.)  Delta ascribed the termination to Opon's inability to "obtain financing for the transaction on the agreed-upon terms," identifying the terms as those "acceptable to [Delta]."  (*Id.* at 44-45.)

    3.    The Asset Impairment and Subsequent Bankruptcy Filing

On November 9, 2011, Delta announced a net loss of $429.4 million in the third quarter of 2011.  (*Id.* at 3.)  Most of that loss resulted from Delta's $420.1 million write-down of its Vega Assets.  (*Id.*)  In addition, the Company disclosed that no acquirers had emerged with offers for Delta or its assets.  (*Id.* at 3.)  As a result, Delta announced that it would have to restructure its debt and might have to file for Chapter 11 Bankruptcy. (*Id.*)  The next day, the Company's shares fell from $1.34 to $0.71 per share.  (*Id.*) Then, just over a month later, Delta announced that it had filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code.  (*Id.*)

**B.    PROCEDURAL HISTORY**

On April 18, 2012, George Darwin, a purchaser of Delta's common stock, initiated this action alleging that Defendants had committed fraud in violation of Securities Exchange Act §§ 10(b) and 20(a) and SEC Rule 10b-5.  (Doc. # 1.)  Two months later, on June 18, 2012, another purchaser of Delta stock, Plaintiff Nakkhumpun, moved to consolidate this action with his already pending class action, which was then encaptioned *Nakkhumpun v. Taylor, et al.*, No. 12-cv-01521-PAB-BNB.  Subsequently, the Court ordered that the actions be consolidated under Rule 42(a)(2), appointed Plaintiff Nakkhumpun lead plaintiff, and approved his choice of lead counsel.  (Doc.

# 30.)  On January 8, 2013, Plaintiffs filed a corrected version of their Complaint.  (Doc.

# 36.)  Defendants then filed a Motion to Dismiss for failure to state a claim under Rule

12(b)(6) on February 7, 2013.  (Doc. # 40.)  Defendants' motion is ripe for review.[3]

## II.  STANDARD OF REVIEW

A motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6)

serves the purpose of testing the "sufficiency of the allegations within the four corners

of the complaint."  *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994).  Only

complaints containing "enough facts to state a claim to relief that is plausible on its face"

will survive such motions.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  When

considering a motion to dismiss, the Court must decide whether, assuming that the

allegations are true, "it is plausible and not merely possible that the plaintiff is entitled to

relief under the relevant law."  *Christy Sports, LLC v. Deer Valley Resorts Co.*, 555 F.3d

1188, 1192 (10th Cir. 2009).  Requiring plausibility is not the same as requiring

probability; there "must be more than a sheer possibility that a defendant has acted

unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and quotation marks

omitted).  A complaint alleging facts that are "merely consistent with a defendant's

liability . . . stops short of the line between possibility and plausibility of entitlement

to relief."  *Id.* (citations and quotation marks omitted).

In reviewing motions under Rule 12(b)(6), the Court "must accept all the well-

pleaded allegations of the complaint as true and must construe them in the light most

favorable to the plaintiff."  *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991).

However, that is not so for allegations that are conclusory and "do not allege the factual

---

[3]     Plaintiffs filed their Brief in Opposition to Defendants' Motion to Dismiss on March 7, 2013 (Doc. # 42), and Defendants filed their Reply on March 27, 2012 (Doc. # 44).

basis" for the claim.  *Brown v. Zavaras*, 63 F.3d 967, 972 (10th Cir. 1995); *see also Tal v. Hogan*, 453 F.3d 1244, 1252 (10th Cir. 2006) (citations and quotation marks omitted).  A complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

> To state a claim under Rule 10b-5 for securities fraud, a plaintiff must allege that:
>
> (1)  the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with *scienter,* that is, with the intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.

*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003).

> Plaintiffs alleging violations of Rule 10b-5 must comply with the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737 (codified as amended in scattered sections of Title 15 of the United States Code).  Rule 9(b) requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting the fraud or mistake."  "At a minimum, Rule 9(b) requires that a plaintiff set forth the who, what, where, and how of the alleged fraud[,] . . . the time, place, and contents of the false representation, and the identity of the party making the false statements."  *United States ex rel. Sikkenga v. Regence Bluecross Blueshield*, 472 F.3d 702, 726-27 (10th Cir. 2006) (quotation marks and citations omitted).  Still, Rule 9(b) "must be read in conjunction with the principles of Rule 8, which calls for pleadings to be simple, concise, and direct, and to be construed as to do substantial justice."  *Schwartz v. Celestial*

*Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997) (quotation marks, citation, and lacuna omitted).

Additionally, the PSLRA requires that Rule 10b-5 complaints "specify each statement alleged to have been misleading, the reason or reasons the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is made."  15 U.S.C. § 78u-4(b)(1).  Concerning the defendant's alleged state of mind, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  In essence, the PSLRA requires Rule 10b-5 plaintiffs to allege with particularity the defendant's fraudulent acts and state of mind.  *See Adams*, 340 F.3d at 1095-96.  At the same time, however, the PSLRA did not "abolish the concept of notice pleading." *Id.* at 1101 (observing that the "PSLRA did not . . . purport to move up the trial to the pleading stage").

### III.  DISCUSSION

Plaintiffs allege that Defendants committed fraud in violation of Securities Exchange Act § 10(b) and Rule 10b-5.  Specifically, the alleged fraudulent conduct consists of: (A) making statements concerning Delta's liquidity and financial condition that were false or misleading, or both; (B) making statements concerning Delta's contemplated sale of assets to Opon International that were false or misleading, or both; and (C) overstating the value of some of its oil and gas assets by delaying recognition of their impaired value.  The Court will separately evaluate these three categories of conduct.

A. **STATEMENTS CONCERNING DELTA'S LIQUIDITY AND FINANCIAL CONDITION**

Defendants identify six alleged statements that they argue are not material under Rule 10b-5 and are thus not actionable.  (Doc. # 40 at 8-9.)  Defendants also imply that the other statements concerning Delta's liquidity and financial condition may be immaterial.  (*Id.* at 11 ("Even if not considered puffery . . . .").)  In response, Plaintiffs contend that "at least" four of the six alleged statements argued to be immaterial by Defendants are in fact material.  (Doc. # 42 at 9.)  Although both Plaintiffs and Defendants may have implicitly conceded the materiality or immateriality of certain statements,[4] the Court will evaluate the materiality of all of the statements identified in Plaintiffs' response.

1. Legal Standards

a) *Materiality*

For a statement to be material there must be a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (citing *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).  The *Basic* court attempted to strike a balance between too minimal a standard which would result in an overabundance of trivial information and

---

[4]     In their Motion to Dismiss, Defendants assert that "[t]he vast majority" of the alleged statements are immaterial (Doc. # 40 at 8), before arguing that six specific statements are immaterial (*Id.* at 8-9).  Defendants go on to argue that other statements, "[e]ven if not considered" immaterial, were not false.  (*Id.* at 11.)  Plaintiffs respond that, "of the six statements characterized by Defendants" as immaterial, "at least four" are material.  (Doc. # 42 at 9.)  Plaintiffs also identify nine other statements alleged to be "materially false or misleading."  (*Id.* at 6.)  Because both Defendants and Plaintiffs only specifically argue the materiality of a subset of all the alleged statements and argue the materiality of others generally, the Court will consider the materiality of every alleged statement specifically identified by either party.

too high a standard which would permit management to withhold information of real consequence to investors.  *Id.* at 231 (citing *TSC Industries*, 426 U.S. at 448-48). Courts have identified at least two categories of immaterial statements: (1) those deemed immaterial "because they are only vague statements of corporate optimism" and (2) those deemed immaterial because "other documents available to the public "bespoke caution" about their subject matter.  *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997).  The first category is relevant in this case.[5]

    b)    Statements of Corporate Optimism

    "Up to a point, companies must be permitted to operate with a hopeful outlook: 'People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data dictates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.'" *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994)).  A corporation's self-praise about its business strategy plays no serious role in market participants' evaluation of potential investments.  *S.E.C. v. Curshen*, 372 Fed. App'x 872, 879-80 (10th Cir. 2010) (unpublished) (citing *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 571 (6th Cir. 2004)). Reasonable investors do not normally rely on vague, optimistic statements in making investment decisions.  *Grossman*, 120 F.3d at 1119 (citations omitted).  "These are

---

[5]    Defendants argue that the "bespeaks caution" doctrine applies here, too.  (*See* Doc. # 40 at 9 ("[A]ny suggestion that Delta was painting an overly optimistic picture of its financial position is completely undermined by the contents of its public disclosures.").)  That doctrine, however, applies only to forward-looking statements and not to statements concerning current facts.  *See S.E.C. v. Goldstone*, --- F. Supp. 2d ----, ----, 2013 WL 3456875, at *122 (citing *Plumbers Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 773 (1st Cir. 2011)).  Because the only forward-looking statement at issue here is immaterial for other reasons, the Court need not discuss or apply the "bespeaks caution" doctrine.

the sort of soft, puffing statements, incapable of objective verification" *Id.* at 1121-22.

Courts have described these statements as "rosy affirmation[s] commonly heard from

corporate managers and numbingly familiar to the marketplace—loosely optimistic

statements that are so vague, so lacking in specificity, or so clearly constituting the

opinions of the speaker," that no reasonable investor would rely on them. *Shaw*

*v. Digital Equipment Corp.*, 82 F.3d 1194, 1218 (1st Cir. 1996) (citations omitted).

Further, even statements on important topics may be "nothing more than puffery."

*In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1340 (10th Cir. 2012).  That is

because both the subject matter of the statement and the statement itself must be

material.  *Id.* at 1339-40 (though "reasonable investors wanted to know" about the

subject matter, not "everything defendants said on the topic was material").

No bright line distinction exists between immaterial statements of corporate

optimism and those of material fact.  *In re Sprint Sec. Litig.*, 232 F. Supp. 2d 1193, 1217

(D. Kan. 2002).  Courts evaluate whether alleged statements are material in light of the

context in which they were made.  *Grossman*, 120 F.3d at 1121.  Normally, the question

of materiality belongs to the finder of fact; however, a court may decide the issue as a

matter of law when "the information is so obviously important [or unimportant] to an

investor that reasonable minds cannot differ on the question of materiality."  *S.E.C.*

*v. Cochran*, 214 F.3d 1261, 1267 (10th Cir. 2000) (citing *Connett v. Justus Ents. of*

*Kansas, Inc.*, 68 F.3d 382, 384 (10th Cir. 1995) (internal quotations omitted) (brackets

in original)).

2.    <u>Analysis</u>

Regarding Delta's liquidity and financial condition, Plaintiffs have alleged statements that can be divided into three categories relevant to the Court's analysis of materiality and falsity: (1) statements concerning current or past facts, (2) statements of opinion concerning current facts, and (3) statements concerning future performance. The Court will discuss these categories of statements in turn, below.

a)    *Statements Concerning Current or Past Facts*

(i)    <u>*Materiality*</u>

Reasonable investors are more likely to consider statements concerning current and past facts important because such statements are more apt to be objectively verifiable.  *In re Sprint*, 232 F. Supp. 2d at 1217.  By contrast, reasonable investors are simply not likely to rely on statements they cannot verify.  *Id.* (citing *Grossman*, 120 F.3d at 1122-23).  For example, in *Grossman*, the Tenth Circuit concluded that statements that the defendant had experienced "substantial success" in post-merger integration and that the merger was moving "faster than we thought" were incapable of objective verification.  120 F.3d at 1121.  In *Level 3*, the same was true of the defendant corporation's statement that it was a "logical consolidator with proven integration experience."  667 F.3d at 1340.  Similarly, the statement that the corporation was focusing on "integration and getting synergies" from past acquisitions was "vague (if not meaningless) management-speak," and broad statements that integration of the acquired companies was "progressing well" and was beginning to yield beneficial "synergies," and that "overall customer experience [was] still positive," were mere puffery.  *Id.*

In contrast, in *Level 3* the Tenth Circuit deemed the following assertions to be material because they were "objectively verifiable matters of fact" and "particularly concrete":  (1) that "the majority" of the company's integration of an acquired company was complete, "ahead of plan," and "under budget"; (2) that "a majority of the physical network interconnections [were] completed"; (3) that the acquired company would "have generally done, substantially done, . . . 85%, 90% done with those efforts"; and (4) that "[m]ost of the physical integration" of the acquired company was then complete.  *Id.* Similarly, several statements in *Grossman* were deemed material because they "could have, and should have had, some basis in objective and verifiable fact."  *Grossman*, 120 F.3d at 1123.  In those statements, the *Grossman* defendants described a product's recent "increase in market share . . . from . . . 20% . . . to more than 40%," an "accelerated" pace of new product development, and that a merger was the "smoothest in recent history."  Further, statements using words with set meanings, like "preservation of capital," were deemed material because they were even less vague than the material statement about how "'smoothly' a merger ha[d] gone" in *Grossman*.  *See In re Oppenheimer Rochester Funds Group Securities Ligitation*, 838 F. Supp. 2d 1148, 1160-61 (D. Colo. 2012) (comparing *Grossman*, 120 F.3d at 1123).

In the instant case, the following statements are too vague to be susceptible to objective verification and, therefore, are immaterial: (1) Defendant Lakey's statement on March 17, 2011, that "the results of [an] [*sic*] improved fourth quarter that demonstrates clear operational achievements and the resulting substantial improvement in our financial performance" (Doc. # 36 at 62); (2) Defendant Lakey's August 4, 2011 report of "another solid operating quarter coupled with the accomplishment of some very

important strategic steps" (*id.* at 71); (3) Defendant Lakey's May 11, 2011 statement that

"our results are validating our strategy of focusing on the profitability of future potential

of our core assets in the Piceance Basin" (*id.* at 67); (4) Defendant Lakey's August 4,

2011 statement that Delta had been "transformed" and "put its house in order" (*id.* at

73); and (5) Defendant Wallace's May 10, 2010 statement that Delta was "very, very

encouraged by what [it was] seeing in the field and the sooner those wells [were]

completed the more meaningful impact they [would] have on production" (*id.* at 41).

On the other hand, the following four statements are more than mere corporate

optimism in that they described improved "liquidity" and "cash flow" which have set

meanings and are as objectively verifiable as the material statements in *Level 3* and

*Grossman*:  (1) on March 11, 2010, while discussing Delta's results from the full year

and fourth quarter of 2009, Defendant Wallace stated that Delta's "liquidity situation

ha[d] also improved materially"  (*Id.* at 33.); (2) on the same day, Defendant Wallace

represented that Delta was "in a far better liquidity and financial situation" than at the

same time the prior year (*Id.* at 34.); (3) on March 16, 2011, Defendant Lakey discussed

Delta's results from the full year and fourth quarter of 2010, stating that Delta had

"substantially improve[d]" its "cash flow" (*Id.* at 57.); and (4) Defendant Lakey stated on

May 10, 2011, that Delta was "pleased to have posted another solid financial quarter

driven by increased production from [its] core asset" (*Id.* at 64.).  These statements were

specific and concrete enough to be objectively verified.  Thus, all four statements are

material.

            (ii)    <u>*Falsity*</u>

Having identified four material statements, the Court next turns to the question

of whether they were false or misleading when made.  In their motion to dismiss,

Defendants argue that Plaintiffs have not alleged facts showing the alleged statements

were false or that the factual bases that accompanied those statements were false.

(Doc. # 40 at 12-13.)  Plaintiffs contend that these statements were false or misleading

when made because they would "'give a reasonable investor the impression of a state

of affairs that differs from the one that actually exists.'"  (Doc. # 42 at 6 (quoting *Berson*

*v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)).)

Under the PSLRA, the pertinent question is whether the Complaint specifies "the

reason or reasons why th[e] [material] statements were misleading."  *Adams v. Kinder-*

*Morgan*, 340 F.3d 1083, 1097 (10th Cir. 2003) (citing 15 U.S.C. § 78u-4(b)(1)).  This

does not mean Plaintiffs must show a "direct contradiction[]" between the facts alleged

and Defendants' statements.  *In re Level 3*, 667 F.3d at 1343.  Rather, Plaintiffs will have

met their burden if a reasonable person would have understood Defendants' statements

as "inconsistent with the facts on the ground" depicted by Plaintiffs' allegations.  *See id.*

The Court approaches this inquiry taking the Plaintiffs' allegations "as a whole."  *Adams*,

340 F.3d at 1099.  Ultimately, the Court concludes that Plaintiffs have not met their

burden.

To begin with, a reasonable investor would understand Defendant Wallace's

assertion on March 11, 2010, that Delta's "liquidity situation" had improved materially, to

refer to specific improvements made during the fourth quarter of 2009, during the full

year 2009, or during both.  Defendant Wallace made the statement in a press release

describing Delta's performance during those periods.  In addition, the statement attributes "no small part" of the liquidity improvement to Delta having received proceeds from a litigation settlement, money used by Delta to pay down its senior credit facility. Moreover, the previous paragraph in that press release also discussed Delta's improved liquidity during the second half of 2009.  That paragraph acknowledged that 2009 had been "very challenging" because of "liquidity and bank covenant concerns," among other things.  Nonetheless, according to Defendant Wallace, during the fourth quarter, cash flow, lease operating expenses, and other performance measures had improved. And "[m]ore importantly," fourth quarter performance meant that Delta would be in compliance with its senior credit facility covenants.  Considering the allegations "as a whole," including the context of the allegedly false statements, the Court concludes that a reasonable investor would have understood Defendant Wallace's statement as a summary of the several ways Delta's liquidity had improved.  Because Plaintiffs have failed to allege any facts casting doubt on those specific improvements, they have failed to allege that Defendant Wallace's March 11, 2010 statement was inconsistent with the facts on the ground.

By the same token, Defendant Wallace's comment during the March 11, 2010, conference call was entirely consistent with the "facts on the ground" depicted by Plaintiffs' allegations.  A reasonable investor could understand this statement to mean only that Delta's liquidity was "far better" than in early March of 2009.  Even if Delta's liquidity problems became "more acute" before March 2010, which Plaintiffs failed to specifically allege, it is not clear that Delta's liquidity position at that time was worse than in March 2009.  Plaintiffs' allegations of more acute problems in "early 2010" are

even less demonstrative of circumstances that were inconsistent with Wallace's comment.  The same is true of allegations that Delta defaulted on certain debt covenants in March 2010.  Even if Delta defaulted before March 11, 2010, Delta's liquidity position may have been better than it was in March 2009.  And again, Plaintiffs have not specifically alleged that the purported default occurred before the date Defendant Wallace made the statements, *i.e.*, March 11, 2010.

Likewise, none of the confidential witnesses' statements indicate a downward change in Delta's liquidity condition between March 2009 and March 2010.  Confidential Witness 1 described "feeling concerned" about Delta's liquidity and that the Company "had a liquidity issue" from 2009 through 2011.  (Doc. # 42 at 4.)  Confidential Witness 4 described Delta's practice of delaying payments to vendors as beginning in March 2009 and continuing through 2010.  (*Id.* at 5.)  Confidential Witness 6 stated that Delta had cash flow problems at "many points in time."  (*Id.*)  None of these statements are inconsistent with an improvement in liquidity between March 2009 and March 2010.  Finally, Confidential Witness 6 stated that Delta was "struggling" and on a "long slow demise" beginning in March 2009.  (*Id.* at 5.)  These statements are simply too vague and unsubstantiated to depict a state of affairs at odds with the assertion that Delta's liquidity condition improved between March of 2009 and March of 2010.

The Court also concludes that Plaintiffs have not sufficiently alleged that Defendant Lakey's March 16, 2011 statement concerning Delta's "cash flow" was false.  Like the allegations regarding Delta's liquidity, Confidential Witness 2's statements concerning Delta's cash flow do not depict a state of affairs inconsistent with Defendant Lakey's representation that Delta's "cash flow" had "substantially improve[d]."  Most of

16

Confidential Witness 2's statements amount to nothing more than conclusory allegations that Defendants lied about Delta's cash flows.  (*Id.* at 6-7.)  Only one of Confidential Witness 2's statements gives a reason for those conclusions: "I didn't see any improvement in cash flow [as of March 16, 2011]."  However, that assertion is devoid of substantiating facts illustrating a state of affairs that was inconsistent with Defendant Lakey's statement.

Finally, Plaintiffs fail to allege anything that casts doubt on the truth of the statement made by Defendant Lakey in the May 10, 2011 press release.  He stated that Delta had "increased production from [its] core asset" in the first quarter of 2011.  Later in that same press release he mentioned that "production was up 4% over the fourth quarter, [but] it was slightly beneath [Delta's] expectations due to timing decisions on [its] inventory wells as a result of shale well activity."  (Doc. # 36 at 64.)  Plaintiffs have not adequately alleged the falsity of this May 10, 2010 statement.

In general, Plaintiff's apparent strategy is to have the Court draw broad inferences from specific, narrow statements made by Defendants and, at the same time, to have the Court draw narrow, specific inferences from broad, general statements made by Plaintiff's witnesses.  Apparently the Court will then find inconsistencies between the broad inferences drawn from Defendants' statements and the narrow inferences drawn from Plaintiff's witnesses.  Doing so, however, would not comport with the PSLRA's heightened pleading requirement.  Accordingly, Plaintiffs have failed to allege that Defendants' material statements concerning current and past facts were false or misleading, and therefore the Rule 10b-5 claims based on those statements are dismissed.

*b)*      *Statements of Opinion Concerning Current Facts*

Of Defendants' alleged misstatements whose materiality and falsity are disputed,

seven are statements of opinion.  In those statements Defendants expressed pride

and enthusiasm in Delta, high expectations, beliefs about Delta's status and financial

situation, and beliefs about the value of Delta's shares.  Considering the nuanced legal

standards governing materiality and falsity of opinion statements, the Court analyzes

them separately from the other statements of current or past facts.

*(i)*      <u>*Materiality*</u>

Statements of opinion may be material.  *Virginia Bankshares, Inc. v. Sandberg*,

501 U.S. 1083, 1090 (1991).  The Supreme Court explained in *Virginia Bankshares* that

"there is no room to deny that a statement of belief by corporate directors about a

recommended course of action, or an explanation of their reasons for recommending it,"

can be important to a reasonable investor.  *Id.* at 1090-91 (quoting *TSC Indus., Inc.*

*v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).  In that case, a company's directors

solicited proxies from its shareholders and represented to them that the price offered

for their stock was "high" and that the proposed merger was "fair" to them.  *Id.* at 1088,

1094.  The Supreme Court held that those statements would be important to

shareholders facing a proxy request because those shareholders knew that corporate

directors had knowledge and expertise exceeding their own and had a state law duty to

exercise their expertise for the shareholders' benefit.  *Id.* at 1091.  With respect to the

materiality of directors' statements of opinion or belief, *Virginia Bankshares* teaches that

reasonable investors are more apt to consider directors' opinions important, and that the

context in which the opinion was communicated—in that case, a proxy solicitation—is also critical to determining the materiality of opinion statements.

Just as the proxy solicitation context was critical to the materiality determination in *Virginia Bankshares*, negative publicity can also create a context in which statements of belief are deemed material.  In *City of Monroe Employees Retirement System v. Bridgestone Corp.*, 399 F.3d 651, 672 (6th Cir. 2005), plaintiffs sued a tire manufacturer alleging that it made misstatements in violation of Rule 10b-5.  In July 2000, third parties filed multiple lawsuits alleging the manufacturer's tires had caused fatal car crashes, and safety groups called for the tires to be withdrawn from the market. *Id.*  The next month, the manufacturer stated that it "continually monitor[ed] the performance of all [its] tire lines, and the objective data clearly reinforce[d] [its] belief" that the tires were safe and of high quality.  *Id.*  The court deemed this statement material because it could reasonably have been viewed as a direct response to public allegations that the tires were unsafe.  *Id.*

In the instant case, the *Virginia Bankshares* rationale is applicable to each of the alleged statements of opinion made by Defendants, as the opinions expressed belonged to directors, upon whose knowledge and expertise reasonable investors are likely to rely.  *See Virginia Bankshares*, 501 U.S. at 1091.  Moreover, Defendants allegedly made these statements in the context of public awareness that substantial financial challenges were facing Delta.  As Defendants emphasize, Delta publicly warned investors of the serious financial obstacles it faced.  Such warnings cannot inoculate these statements of their materiality because, under Tenth Circuit precedent, the "bespeaks caution" doctrine does not apply to statements of opinion or belief.  *See*

*Grossman*, 120 F.3d at 1123 (quoting *Virginia Bankshares*, 501 U.S. at 1093) ("[S]uch statements of opinion or belief must rest on 'a factual basis that justifies them as accurate, the absence of which renders them misleading.'")

Nonetheless, opinions that "on their own terms and in context, lack[] a standard against which a reasonable investor could expect them to be pegged . . . are too squishy, too untethered to anything measurable" to be material. *Id.* at 671 (citations omitted). Applying that standard in *City of Monroe*, the Sixth Circuit deemed immaterial the tire manufacturer's expression of "full confidence" in its tires and its statement that its "experience with [the tires] indicates high consumer satisfaction with the quality and reliability" of the tires. *Id.*

In the instant case, and in light of the aforementioned authorities, four of Defendants opinion statements are immaterial. First, Defendant Wallace stated on March 11, 2010, "Given how challenging our situation was, I can't help but be proud of how far we've come and where we stand today." (Doc. # 36 at 34.) Second, Defendant Taylor stated on August 4, 2011, "I absolutely share your enthusiasm about our progress at Delta." (*Id.* at 72.) Third, Defendant Taylor stated in a May 11, 2011 conference call with investors, "I'm expecting a very promising year for Delta and what I've seen to date only heightens my expectations." (*Id.* at 66.) Fourth, Defendant Lakey stated on March 17, 2011, "Coupled with the plan for 2011, we believe we are well positioned to enhance shareholder value if we execute. And I'm confident we will." (*Id.* at 62.) Like the tire manufacturer's expression of "full confidence" in its tires and that there existed "high consumer satisfaction," these "squishy" statements by Defendants cannot be measured against any standard and are therefore immaterial statements of corporate optimism.

By contrast, the Court concludes that the following three statements were sufficiently tethered to measurable standards to be material.  First, Defendant Wallace commented in Delta's May 10, 2010 investor conference call, "[W]e believe we are in a far better financial situation than we were a year ago and the preservation of our liquidity is essential."  (*Id.* at 40-41.)  Second, in an August 4, 2011, investor conference call, Defendant Lakey stated, "[O]ur current share price is apparently not in alignment with the value of the asset and the company."  (*Id.* at 74.)  Third, during the same call, Defendant Taylor asserted, "Delta is currently trading at an amazing 50% discount."  (*Id.* at 72.)  Accordingly, the Court will address these statements to determine whether they were false or misleading.

### (ii)   *Falsity of Material Statements of Opinion*

Material "statements of opinion or belief must rest on 'a factual basis that justifies them as accurate, the absence of which renders them misleading.'"  *Grossman*, 120 F.3d at 1123 (quoting *Virginia Bankshares*, 501 U.S. at 1093).  By making a material statement of opinion, a speaker impliedly asserts three facts: "(1) that the statement is genuinely believed, (2) that there is a reasonable basis for the belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement."  *In re Exabyte Corp. Sec. Litig.*, 823 F. Supp. 866, 871 (D. Colo. 1993) (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989)).  As a result, opinion statements are misleading to the extent that any of those three implied facts are untrue.  *See Virginia Bankshares*, 501 U.S. at 1092.  The implied facts all involve the speaker's state of mind, and so proving that they are false requires proving scienter.  *See Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 154

21

(S.D.N.Y. 2004), *see also California Public Employees' Retirement System v. Chubb Corp.*, No. 00-4285, 2002 WL 33934282, at *17 (D.N.J. June 26, 2002) (unpublished); *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, at 990 (W.D. Wis. 2003) (whether plaintiff sufficiently pled that defendant had "actual knowledge" of forward-looking statement's falsity "overlaps with the issue of scienter").

In the Tenth Circuit, motive and opportunity are considered relevant, but alone not sufficient, to establish the requisite state of mind. *See Caprin v. Simon Trans. Servs., Inc.*, 99 Fed. App'x 150, 161 (10th Cir. 2004) (unpublished) (citing *Fleming*, 264 F.3d at 1263). If the state of mind of defendants is established via statements made by confidential witnesses, such witnesses should be "'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 51 (1st Cir. 2008) (quoting *In re Cabletron Sys. Inc.*, 311 F.3d 11, 29 (1st Cir. 2002)). Moreover, factors considered in determining the value of confidential witnesses include the "level of detail provided by the confidential sources, the corroborative nature of other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Id.* (citations and quotation marks omitted).

As stated previously, Plaintiffs have alleged the following material statements of opinion: (1) "[W]e believe we are in a far better financial situation than we were a year ago and the preservation of our liquidity is essential" (Doc. # 36 at 40-41); (2) "our current share price is apparently not in alignment with the value of the asset and the

company" (*id.* at 74); and (3) "Delta is currently trading at an amazing 50% discount" (*id.* at 72).  Plaintiff alleges that Defendants knew those statements were false, or at least had no reasonable basis in fact to support them, but made them anyway.  (Doc. # 42 at 7-8.)  The question is whether, taking the allegations collectively and accepting them as true, a "reasonable person [would] deem the inference of scienter at least as strong as any opposing inference."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007).

With respect to the first statement that Delta was in a "far better financial situation" on May 10, 2010, than in the prior year, Plaintiffs have alleged no facts casting doubt on Defendant's belief or basis to believe that the statement was true.  To be sure, Plaintiffs have alleged many facts demonstrating that Delta was, in general, experiencing significant difficulties beginning in 2009.  According to Plaintiffs' witnesses, Delta had a "liquidity issue" beginning in 2009 and began a "long slow demise" when banks tightened their credit agreements with it in March 2009.  (Doc. # 42 at 4-5.) However, these statements are unsubstantiated by any facts, and the Court therefore assigns them little weight.  Plaintiffs' witnesses also state that Delta: began to delay paying vendors in March 2009, raised capital through an equity offering in May 2009 to avert bankruptcy, and began to consider raising capital through an asset sale in September or October 2009.  (*Id.* at 4-5.)  Similarly, Delta's Chief Restructuring Officer stated that Delta sold non-core assets in March 2010.  (*Id.* at 4.)  However, rather than implying that Defendants knew or had reason to know the May 10, 2010 statement was false, the more likely inference from these facts is that Defendants viewed them as contributing to an **improving** financial situation at Delta.

Delta's Chief Restructuring Officer also stated that Delta had liquidity problems
that had become "more acute" in early 2010 and that it defaulted on certain debt
covenants in March 2010.  (*Id.*)  In addition, one confidential witness "fe[lt] concerned"
about Delta's liquidity and ability to pay its debts from 2009 through 2011 and another
believed the company had "cash flow problems" at many points in time.  (*Id.* at 4-5.)  But
these statements are also too vague and imprecise to support a strong inference that
Defendants did not believe or have a reasonable basis in fact for the statement that
Delta was in a far better financial situation in May of 2010 than it had been the prior
year.  In sum, the facts Plaintiffs allege are vague, lack factual substantiation, raise
inferences opposing scienter that are stronger than those supporting scienter, or are
simply ambiguous about the relevant question of what Defendants knew and believed
when making the statement.  Therefore, Plaintiffs have failed to state a claim based on
these statements of opinion.

According to the Complaint, the material opinion statements about the "share
price" and trading "discount" were made by Defendants Taylor and Lakey in a
conference call with investors on August 4, 2011.  (Doc. # 36 at 71-74.)  Defendant
Taylor stated that "Delta [was] currently trading at an amazing 50% discount to the
lowest of these transactions at only $0.16 per Mcfe of [its] 2P reserves from the Williams
Fork alone."  A reasonable investor would understand that statement to mean that
Delta's share price was $0.16 for each "Mcfe" unit of reserves in "2P," one of Delta's
wells in the Williams Fork.  The statement further implies that the $0.16 price is 50% of
the lowest price in an unspecified group of transactions.  Defendant Taylor then said
that "[t]he additional resource of the deeper shale only make our current valuation even

more attractive." (*Id.* at 72-74.)  The context of the statement makes clear that he was referring to "2C," another Delta well drilled into a deep shale formation beneath the Williams Fork.  That well, which had recently begun flowing, had been given a significant valuation by an engineering firm.  In addition to discussing Delta's wells and operations, Defendants identified other improvements, including having used proceeds from two asset divestitures to pay down $106 million in debt, having reduced "Vega LOE" by 60% from the previous year, reducing "G&A" by 35% from the previous year, and increasing "per well EUR" by 22% in the Williams Fork.  After describing those improvements, Lakey stated, "This work was essential to build value in the core asset of the company for our shareholders.  Dan [Taylor] earlier pointed out that our current share price is apparently not in alignment with the value of the asset and the company. I hope this helps you see why we feel this way." (*Id.* at 74.)

Ultimately, Plaintiffs have failed to allege any fact from which a reasonable person could infer that Defendant Taylor did not believe his "50% discount" statement or that he lacked a reasonable basis in fact to make it.  That statement involved a highly specific comparison of Delta's share price to prices reflected in other transactions.  The same is true of Defendant Lakey's statement that the "share price [was] apparently not in alignment with the value of the asset and the company."  Accordingly, Plaintiffs' Rule 10b-5 claims based on these statements are dismissed.

### c)      Statements Concerning Future Performance

Plaintiffs have alleged one optimistic, forward-looking prediction: the May 10, 2010 statement that "[g]oing into 2011, these operational improvements will have a very positive effect on Delta's direction, strategy and asset value." (*Id.* at 60.)  But this type

of prediction is the type of vague, optimistic, "rosy affirmation" reasonable investors would not consider important. *See SRM Global Fund Limited Partnership v. Countrywide Financial Corp.*, 448 Fed. App'x 116, 118 (2d Cir. 2011) (unpublished) ("optimistic statements about future profitability" are mere corporate optimism and not actionable); *see also In re Level 3*, 667 F.3d at 1340 (broad claims that integration is going well and that the company should begin seeing the benefits of resulting synergies were not material but, rather, rosy affirmations that reasonable investors do not find important).  Thus, this statement cannot form the basis of a Rule 10b-5 claim.

## B.    STATEMENTS CONCERNING THE PROPOSED TRANSACTION WITH OPON

Defendants next argue that Plaintiffs have failed to plead adequately that disclosures about Delta's negotiations with Opon were false or misleading.  Specifically, according to Defendants, $400 million truly was the price of the potential sale, and disclosing the price did not constitute a representation by Defendants that the Vega Assets were worth that amount.  (Doc. # 40 at 15.)  It is also true, Defendants argue, that the deal fell through because Opon could not obtain financing on terms acceptable to Delta.  (*Id.*)  Defendants further argue that they had no duty to disclose any more than they did about the negotiations with Opon.  (*Id.*)

Plaintiffs respond that Defendants indeed made misleading statements about the potential $400 million sale to Opon.  (Doc. # 42 at 10-11.)  According to Plaintiffs, Defendants selectively disclosed positive news about the potential deal, issuing a statement when Delta entered a preliminary, non-binding sale agreement, and continuing to issue positive statements about the ensuing negotiations.  (*Id.* at 11-12.)  Plaintiffs argue that the positive statements issued during those negotiations were

misleading because they did not disclose that, while negotiations were continuing, Opon had backed away from the $400 million price and offered a lower price.  (*Id.* at 12-13.) Moreover, Plaintiffs assert that when Defendants ultimately disclosed that the deal had fallen through, they misleadingly attributed it to lack of financing available to Opon and not the true cause, *i.e.*, Opon's conclusion that the Vega Assets were not worth $400 million.  (*Id.* at 13.)

        1.   <u>Legal Standards</u>

            a)   *Duty to Disclose to Cure Misleading Statements*

"Silence, absent a duty to disclose, is not misleading under Rule 10b-5."  *Basic Inc.*, 485 U.S. at 239 n.17.  "[Section] 10(b) and Rule 10b-5 do not create an affirmative duty to disclose any and all material information."  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1321 (2011).  But "[d]isclosure is required . . . when necessary 'to make . . . statements made, in light of the circumstances in which they were made, not misleading."  *Id.* (quoting 17 C.F.R. § 240.10b-5 (second lacuna in original)).  The statement made must be material, and the omitted fact must "alter[] the meaning of the statement."  *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002) (quoting *In re Boston Tech.*, 8 F. Supp. 2d 43, 53 (D. Mass. 1998)).  Thus, disclosure is required only if statements actually made were misleading, *i.e.*, if they would have given a "'reasonable investor the impression of a state of affairs that differ[ed] in a material way from the one that actually exists.'"  *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011) (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)).  The question is whether the omission of facts rendered "what was

revealed . . . so incomplete as to mislead." *Hill v. Gozani*, 638 F.3d 40, 57 (1st Cir.

2011).

A company does not issue misleading statements when it discloses some, but

not all, of the information it has about a strategic transaction, so long as the "information

[it did] provide—and the reasonable inferences one could draw from that information—

[are] entirely consistent with the more detailed explanation" that allegedly should have

been disclosed. *Brody v. Transitional Hospitals, Corp.*, 280 F.3d 997, 1007 (9th Cir.

2002). In *Brody*, the defendant corporation disclosed that "certain parties . . . [had]

indicated an interest in acquiring" either the entire company or the company less a

subsidiary. In addition, the defendant disclosed that it had "engaged financial advisors

to advise [it] in connection with a possible sale." Those disclosures, the plaintiff

shareholders argued, were misleading because they failed to state that the defendant

had received "actual proposals from three different parties." However, the Ninth Circuit

concluded that these statements were not misleading because the disclosures did not

imply an absence of actual proposals or anything else untrue about the "stage of the

negotiations." In fact, the disclosures suggested reasonable inferences about the

proposals and negotiations that were consistent with the more detailed information

that allegedly should have been disclosed. *Id.*

When a company announces that it is pursuing a particular goal and identifies

the means it has chosen to reach that goal, it has a duty to disclose other means that

are under "active and serious consideration." *See State of New Jersey and its Division

of Investment v. Sprint Corp.*, No. 03-2071, 2004 WL 1960130, at *6 (D. Kan. Sept. 3,

2004) (unpublished) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir.

1993)).  Likewise, when a corporation announces, touts, or reiterates a tentative plan, those statements are misleading if the corporation fails to disclose that it is certain, or very nearly certain, that the plan will not succeed.  As such, it is misleading to make "unabashedly positive" statements while simultaneously in possession of "specific, objective facts" that cast doubt on those statements.  *Hill v. Gozani*, 638 F.3d at 152-53 (discussing *Matrixx*, 131 S. Ct.  at 1323).  Even when the plan is tentative and specific threats to the plan are disclosed, the statement is misleading if the corporation knew the plan would fail.  *Cf. Rubinstein v. Collins*, 20 F.3d 160, 171 (5th Cir. 1994) ("[T]he inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known material, adverse facts.")  The omitted information need not directly contradict what was actually said; rather, it is enough if the omission renders the statement materially misleading.  *In re Time Warner Inc.*, 9 F.3d at 268.

> b)    *Strong Inference of Scienter*

The PSLRA, enacted in 1995 "'to curb abuse in private securities litigation,'" heightens the "pleading standard for securities fraud actions in general, and for scienter allegations in particular."  *City of Philadelphia v. Fleming Cos. Inc.*, 264 F.3d 1245, 1258 (10th Cir. 2001) (quoting *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 191 (1st Cir. 1999)).  That statute requires private plaintiffs to "state with particularity facts giving rise to a **strong inference** that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added).

In securities fraud cases, the scienter element is satisfied if the defendant acted with "a mental state embracing the intent to deceive, manipulate, or defraud, or recklessness."  *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1105 (10th Cir. 2003)

(quoting *Fleming Cos.*, 264 F.3d at 1259) (quotation marks omitted).  A defendant's

conduct is reckless if it "is an extreme departure from standards of ordinary care, and

. . . presents a danger of misleading buyers or sellers that is either known to the

defendant or is so obvious that the actor must have been aware of it."  *Dronsejko*

*v. Thornton*, 632 F.3d 658, 665 (10th Cir. 2011) (citing *Fleming*, 264 F.3d at 1258)

(quotation marks omitted).

According to the Supreme Court, the PSLRA's "strong inference" of scienter is

not satisfied when "a reasonable factfinder plausibly could infer from the complaint's

allegations the requisite state of mind."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551

U.S. 308, 314 (2007).  Instead, the court must compare the "inferences urged by the

plaintiff" with "competing inferences rationally drawn from the facts alleged."  *Id.*  For the

inference of scienter urged by the plaintiff to "qualify as strong . . . [it] must be more than

merely plausible or reasonable—it must be cogent and at least as compelling as any

opposing inference of nonfraudulent intent."  *Id.*

Further, as mentioned above, confidential witnesses should be "'described in

the complaint with sufficient particularity to support the probability that a person in the

position occupied by the source would possess the information alleged.'"  *New Jersey*

*Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 51 (1st Cir.

2008) (quoting *In re Cabletron Sys. Inc.*, 311 F.3d 11, 29 (1st Cir. 2002)).  Moreover,

factors considered in determining the value of confidential witnesses' statements include

the "level of detail provided by the confidential sources, the corroborative nature of other

facts alleged (including from other sources), the coherence and plausibility of the

allegations, the number of sources, the reliability of the sources, and similar indicia." *Id.*
(citations and quotation marks omitted).

> c)  *Loss Causation*

Loss causation links the fraud with the harm; it is "the causal connection between
the [defendants'] material misrepresentation and the [plaintiffs'] loss." *Dura
Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  However, merely, alleging
that a misrepresentation resulted in an inflated stock price falls short of alleging loss
causation.  *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1136-37 (10th Cir.
2009) (citing *Dura Pharmaceuticals*, 544 U.S. at 347).  Instead, a plaintiff must allege
that the losses "were attributable to the revelation of the fraud." *Id.* at 1137.

Moreover, for that revelatory disclosure to be corrective of the alleged fraud,
"it must at least relate back to the misrepresentation and not to some other negative
information about the company." *Id.* at 1140 (citing *Caremark, Inc. v. Coram Healthcare
Corp.*, 113 F.3d 645, 649 (7th Cir. 1997)).  On the one hand, not "every bit of negative
information" is corrective of a prior misrepresentation, but on the other, a court cannot
be too "exacting in [its] demands for a connection between the initial misrepresentation
and subsequent revelation." *Id.*

> 2.  Analysis

Plaintiffs allege that Defendants made misstatements concerning (a) Delta's
continuing negotiations to sell a stake in its Vega Area assets to Opon International
and (b) misstatements concerning the reason those negotiations ended.  Defendants
dispute that the statements at issue were misleading, that they were made with scienter,
and that they caused Plaintiffs losses.

   a)      *Statements Concerning Delta's Continuing Negotiations with Opon*

The Court turns first to Defendants' arguments that their statements concerning

Delta's negotiations with Opon were not misleading and did not cause Defendants'

losses.  Because Plaintiffs have adequately alleged that Defendants' statements

concerning Delta's ongoing negotiations with Opon were misleading, the Court will also

consider whether Plaintiffs have adequately pled scienter and loss causation with

respect to those statements.

   (i)      <u>Duty to Disclose to Cure Misleading Statements</u>

As described in Section I.A.2, *supra*, on May 10, 2010, Defendants issued a

release describing Opon as its "potential partner" and stating that Delta and Opon were

"continu[ing] to work . . . toward the signing of definitive agreements and closing" the

deal.  (Doc. # 36 at 38.)  The release also reiterated the deal's details as previously

disclosed on March 18, 2010.  It described the "non-binding letter of intent" and its

terms, including the $400 million price, the 37.5% portion of Vega Assets involved in the

transaction, and the issuance of warrants.  (*Id.*)  It also reiterated that "consummation"

depended on Opon obtaining financing and was "subject to customary due diligence,

negotiation and execution of definitive binding agreements."  (*Id.*)  To the Court's mind,

a reasonable investor would infer from this press release that the $400 million offer was

still on the table.  On the same day, Defendant Taylor stated in a conference call with

investors that Delta was "continu[ing] to work with Opon in their [*sic*] financing efforts

and [was] working towards signing a definitive purchase and sale agreement" and that

Delta was "pleased that the process [was] going well."  (*Id.* at 40.)  Taken together with

the May 10, 2010 press release, this statement would be interpreted by a reasonable

investor to mean that the terms of the "definitive purchase and sale agreement" toward which Defendants were "continuing to work" did not vary significantly from those announced on March 18, 2010.

On June 1, 2010, Delta announced publicly that the "expected time frame to sign a definitive Purchase and Sale Agreement with Opon" had been extended, adding that Delta was continuing to "work with Opon in its financing efforts" and that "both parties [were] working towards signing a definitive Purchase and Sale Agreement." (*Id.* at 43.) Again, Delta reiterated all of the deal's terms, just as it had in its May 10 statement, which would again have led reasonable investors to believe those terms remained intact.[6]

Plaintiffs allege that when Defendants made these statements on May 10 and June 1, 2010, Opon had already backed away from the $400 million price. Because Defendants' statements were inconsistent with that alleged fact, they were misleading.

---

[6]     Plaintiffs also argue that Defendants' statements concerning the Opon negotiations were misleading in that they failed to disclose Opon's lower offer, leaving shareholders with the impression that the assets were worth $400 million. (Doc. # 42 at 13.) The Court disagrees.

A corporation is not required to disclose opinions of insiders who disagree with its plans, policies, or strategies. *Cooperman v. Individual, Inc.*, 171 F.3d 43, 51 (1st Cir. 1999) ("[D]isclosure of the business strategy supported by the majority of the Board did not obligate defendants also to disclose the fact that [a dissenting director]—a distinct minority of the multi-member Board—opposed that strategy."). If the dissenting opinion of a board member need not be revealed, then it follows that the opinion of a separate entity about the value of a corporation's assets need not be disclosed. That is especially so when, as here, the separate entity's interest is directly opposed to that of the corporation. If anything, Opon was likely to make an offer that was unrealistically low so as to generate a bargain deal for itself. Therefore, assuming Opon did in fact make an offer substantially lower than $400 million, Defendants' failure to reveal that fact was not misleading.

However, as discussed in the text, *infra*, once Defendants chose to disclose the status of Delta's negotiations with Opon and the reason those negotiations terminated, they had a duty to do so accurately. Therefore, although Defendants did not have to disclose Opon's lower offer, they did have a duty to accurately depict negotiations when discussing them.

*(ii)*     <u>*Strong Inference of Scienter*</u>

Having concluded that Defendants made misleading statements concerning Delta's negotiations with Opon, the Court now turns to the question of whether Plaintiffs have adequately pled that Defendants **knew** those statements were misleading. Specifically, the Court must decide whether Plaintiffs have pled facts giving rise to a strong inference that Defendants knew or were reckless in not knowing that by May 10, 2010, and June 1, 2010, Opon had backed away from the $400 million price.

The only allegations regarding the Opon deal come from Confidential Witness 3, who is purportedly the President and CEO of Opon.  According to Plaintiffs, Confidential Witness 3 determined that the Vega Assets were worth less than $400 million based on the current and projected prices of natural gas.  (Doc. # 36 at 15.)  As a result, in the "spring of 2010," Opon decided to terminate the deal at the $400 million price and, instead, offered a lower price that was a "much tougher deal" for Delta.  Delta rejected that offer.  (*Id.*)  These alleged facts do not raise a strong inference of scienter.

Although Opon's President and CEO would certainly be in a position to know whether Opon had communicated its withdrawal of the $400 million price to Delta, his statements lack the level of detail that would support such an inference.  Confidential Witness 3 does not say how much lower Opon's subsequent offer was and, more importantly, does not specify **when** the $400 million offer was withdrawn.  Moreover, Confidential Witness 3's statements are nowhere corroborated by statements from other sources or other allegations.  Therefore, although the alleged facts raise the inference that Defendants might have known that the $400 million offer was off the table, they do not raise a strong inference that such a conclusion is "more than merely plausible or

reasonable." *Tellabs*, 551 U.S. at 314.  Consequently, Plaintiffs' claim that Defendants'

statements on May 10 and June 1, 2010, concerning the Opon transaction were

misleading does not meet the heightened pleading standard under the PSLRA.

(iii)   <u>Loss Causation</u>

Even if Plaintiffs were to have sufficiently pled scienter for these statements, their

attendant claims would not survive analysis of loss causation.  The only loss Plaintiffs

allege occurred on November 10, 2011, the day after Delta announced the impairment

of its Vega Area assets and that it would likely enter bankruptcy.  (Doc. # 42 at 29.)

What made the May 10 and June 1, 2010 statements misleading was that they created

the false impression that Opon was still entertaining a deal at the $400 million price.

For that to have caused Plaintiffs' loss, Delta's stock price would have had to fall on the

date Delta disclosed information that cured the misrepresentation.  But that happened

on July 7, 2010, when Delta announced that its negotiations had fallen through—more

than sixteen months before Plaintiffs allege they suffered their loss.  Therefore,

Plaintiffs' allegations fail to demonstrate that either the May 10 or June 1, 2010

statements caused their loss.

b)   *Statements Concerning the Reason Negotiations Ended*

In addition to Defendants' statements concerning the continuing Opon

negotiations, Plaintiffs also allege that Defendants misrepresented the reason those

negotiations ended.  On July 7, 2010, Delta announced that it had terminated

negotiations with Opon because "Opon was unable to obtain financing for the

transaction on the agreed-upon terms."  (Doc. # 36 at 44-45.)  In the same

announcement, Delta also stated that "Opon was unable to arrange financing for

35

a transaction on terms acceptable to us." (*Id.*)  Plaintiffs allege that this misrepresented

the real reason for the termination of negotiations: Opon would not pay the $400 million

price.

Defendants attack two elements of Plaintiffs' claim based on this statement.

First, they argue that the statement was true and not misleading.  Second, they argue

that the statement did not cause Defendants' loss.  The Court will consider these

arguments in turn.

(i)      <u>Duty to Disclose to Cure Misleading Statement</u>

As stated previously, the question is whether Defendants' statements concerning

termination of negotiations would have given a reasonable investor "the impression of a

state of affairs that differs in a material way from the one that actually exists."  *Reese*

*v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011) (citations and

quotation marks omitted).  Defendants argue that attributing the termination to Opon's

inability to "arrange financing on terms *acceptable to Delta*" is consistent with what

Plaintiffs allege was the real reason.  (Doc. # 40 at 15 (emphasis in original).)

Defendants further assert that "the reason Opon could not obtain financing on the

agreed upon terms" does not matter.  (Doc. # 44 at 5.)

In *Brody*, the alleged misstatement was susceptible to one inference, and it was

consistent with the facts plaintiffs argued should have been disclosed.  *See Brody*, 280

F.3d at 1007.  In contrast, here, Defendants' statement was susceptible to two

inferences, one of which is inconsistent with what Plaintiffs allege was the true reason

negotiations ended.  Defendants' statement implies that two conditions had to occur for

the negotiations to result in a finalized transaction: Opon had to obtain financing, and

36

that financing had to be on terms acceptable to Delta.  The statement mentions both conditions in explaining why negotiations were terminated, but it is ambiguous as to whether one or both conditions failed.  Although a reasonable investor may have inferred that the problem was Delta's terms, it would have been just as reasonable to have inferred that Opon would have been happy with Delta's terms if it could have secured the financing.  The first inference is consistent with Plaintiffs' allegation that negotiations ended because of a problem with the $400 million price, one of Delta's terms.  The second inference, however, is inconsistent with "the more detailed explanation" Plaintiffs' allege should have been disclosed.  *See id.*

The Court concludes that a reasonable investor could draw either of the two competing inferences from Defendants' statement.  Construing the allegations in the light most favorable to Plaintiffs, as it must at this stage in the litigation, the Court concludes that Plaintiffs' have alleged "more than a sheer possibility" that Defendants' statement was misleading.  *See Iqbal*, 556 U.S. at 678.  Therefore, Plaintiffs have adequately alleged that the July 7, 2010 disclosure concerning the termination of Delta's negotiations with Opon was misleading and, thus, as to these statements, Defendants' motion to dismiss must be denied unless there is another ground for granting it.[7]

### (ii)   *Loss Causation*

With respect to loss causation, as described above, Plaintiffs must allege facts to demonstrate that their losses resulted from revelation of this false and misleading statement.  *In re Williams*, 558 F.3d at 1137.  The revelation must be corrective of the

---

[7]      Defendants have not argued that they were unaware negotiations with Opon ended because Opon backed away from the $400 million price for the Vega Assets.  Therefore, the Court assumes, without deciding, that Plaintiffs have adequately pled scienter with respect to Defendants' statement concerning the reason Delta's negotiations with Opon ended.

alleged misrepresentation in that it "relate[s] back to the misrepresentation and not to some other negative information about the company." *Id.* at 1140.

According to Plaintiffs, Defendants stated that the Opon negotiations ended because financing was unavailable, thereby concealing the true reason: that Opon was unwilling to pay $400 million for the assets.  The disclosures that Plaintiffs allege caused the November 10, 2011 share price decline occurred the day before, on November 9, 2011, and included the $420.1 million asset impairment and a bankruptcy warning. (Doc. # 42 at 29.)  That Opon would not pay $400 million for the assets was, according to Plaintiffs, relevant to investors' understanding of what other potential acquirers might bid or pay for the assets.  However, the purported corrective statement—the asset impairment—merely updated the Company's accounting for the assets' value in accordance with Generally Accepted Accounting Principles ("GAAP").  Plaintiffs have not alleged any facts showing that the updated accounting value of the Vega Assets, when disclosed, suggested or implied anything false about Defendants' statement concerning the reason the Opon negotiations terminated.  It is true that both the reason Defendants gave for ending negotiations and the announcement of the asset impairment touched upon the subject of the Vega Assets.  That is not adequate, however, to establish that the asset impairment announcement related back, and was thus corrective of, the misstatement.  *See North Port Firefighters' Pension—Local Option Plan v. Temple-Inland, Inc.*, --- F. Supp. 2d ----, ----, 2013 WL 1263161, at *28 (N.D. Tex. 2013) (statements were not corrective merely because they concerned value of same assets as alleged misstatements).  The asset impairment announcement bore too tenuous a relationship to the misstatement to have corrected that misstatement.

The other fact announced on November 9, 2011, that arguably may have caused Plaintiffs' loss was the heightened risk of bankruptcy.  Like the asset impairment announcement, however, disclosing this risk did not relate back to the misrepresentation Plaintiffs allege.  Opon's decision not to pay $400 million for the Vega Assets was surely bad news for Delta, and every negative event necessarily contributed somewhat to Delta's risk of bankruptcy.  However, the warning that bankruptcy was more likely did not relate back to, and correct, every allegedly concealed bit of bad news.  Nor did the bankruptcy warning relate back to the misstatement at issue here.  This misstatement concealed the risk that the assets might not fetch as high a price as Delta and its shareholders hoped, which is no more connected to the risk of bankruptcy than any other negative event would be.

Therefore, neither of the November 9, 2011 disclosures—the asset impairment and bankruptcy warning—which precipitated Plaintiffs' losses, related back to the July 7, 2010 misstatements.  Consequently, Plaintiffs have failed to allege that these losses incurred on November 10 were "attributable to the revelation of the fraud."  *See In re Williams* at 1137.  Plaintiffs' claims based on the July 7, 2010 statement are dismissed for failure to allege loss causation.

## C.      DELAYED RECOGNITION OF ASSET IMPAIRMENT

Finally, Plaintiffs contend that (1) "Defendants knowingly or recklessly overstated the amount of Delta Petroleum's unproved properties, proved developed reserves[,] and proved undeveloped reserves, which, in turn, understated the Company's expenses and materially understated the amount of the Company's reported losses[,]" and that (2) the

timing of its corrective action, via the impairment charge, violated GAAP.  (Doc. # 36 at

18-33.)  The Court finds that Plaintiffs have failed to state a valid claim on this issue.

As previously indicated, GAAP are those principles recognized by the accounting

profession as the conventions, rules, and procedures necessary to define accounting

practice at a particular time.  Those principles are the official standards adopted by the

American Institute of Certified Public Accountants.  In conjunction with SEC accounting

literature and guidance including, specifically, SEC Regulation S-X, GAAP regulations

comprise the single authoritative source of U.S. accounting and reporting standards.

Under GAAP and SEC Regulation X, undrilled oil and gas locations "can be classified

as having undeveloped reserves only if a development plan has been adopted

indicating that they are scheduled to be drilled within five years, unless the specific

circumstances, justify a longer time."  ASC 932-360-20; SEC Regulation S-X, Rule

4.10(31).  This classification, in turn, requires the existence of a reasonable expectation

that there will exist "financing required to implement the project."  ASC 932-360-20; SEC

Regulation S-X, Rule 4.10(26).

In conducting this review, the Court notes that, under Tenth Circuit law,

"allegations of GAAP violations or accounting irregularities, standing alone, are

insufficient to state a securities fraud claim."  *Fleming Cos.*, 264 F.3d at 1261.

Moreover, the Court will not lightly second-guess a corporation's timing decision relating

to taking an impairment, because such a decision usually hinges on a judgment call.

*See, e.g.*, *In re Loral Space & Telecomms. Ltd. Sec. Litig.*, No. 01 Civ.4388, 2004 WL

376442, at *17 (S.D.N.Y. Feb. 27, 2004) ("When the impairments became so severe as

to require specific accounting charges, and whether the requirements of the accounting principles were satisfied, necessarily involved issues of judgment.").

In the instant case, when Delta announced its third quarter 2011 financial results, the bulk of the net loss it reported came from its $420.1 million impairment of proved and unproved property in the Vega Area.  Specifically, Delta recorded an impairment of $157.5 million of its Vega area unproved leasehold, $239.8 million of its Vega area proved properties, and $2.1 million of its Vega area surface acreage.

The impairment, while ultimately catastrophic for Delta, has not been sufficiently alleged by Plaintiffs to have been in violation of GAAP.  To begin with, the Complaint fails to identify any oil and gas properties that, according to Plaintiff, should not have been accounted for as reserves.  Nor does Plaintiff assert any specific facts demonstrating that Delta failed to have a reasonable expectation that it would have financing to implement drilling projects on those properties.[8]  The requirement to have done so does not, contrary to Plaintiffs' assertion, "ask[] too much" of them.  (Doc. # 42 at 18 (citing *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1193 n.14 (10th Cir. 2003)).)[9] Rather, the PSLRA requires Plaintiffs to offer some particularized support for their allegations without the benefit of discovery.  *See* 15 U.S.C. § 78u-4(b)(3)(B); *cf. In re*

---

[8]      Instead, as Defendants note, "the Complaint concedes that Delta was evaluating a variety of strategic alternative throughout the class period."  (Doc. # 40 at 17-18 (citing relevant portions of the Complaint).)

[9]      In *Pirraglia*, upon which Plaintiffs rely, the Tenth Circuit determined that the plaintiffs had properly pled a securities fraud claim, based on improper accounting practices, by alleging both motive and opportunity, as well as specifically pleading: (1) the identity of the source of a report that the defendant corporation's president had created a fictitious revenue category to account for the shortfall between actual and target sales numbers; (2) the amount of money involved; and (3) the explanation that the source had learned of the fictitious category when one of the corporation's accountants had shown him a spreadsheet containing it.  339 F.3d at 1193.  Here, no facts of comparable specificity have been alleged.

*Petsmart, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 993 (D. Ariz. 1999) ("The pleading must provide some particularized support regarding inventory levels, the defendants' knowledge, and approximately when plaintiffs think the write-down should have occurred.").

Additionally, Plaintiffs do not cite any internal documents or witnesses who fault Delta's accounting methodology or the timing of the impairment charge or who otherwise suggest that, based on GAAP, the charge should have been taken in an earlier quarter.  *In re Mirant Corp. Sec. Litig.*, No. 1:02-CV-1467, 2009 WL 48188, at *22 (N.D. Ga. Jan. 7, 2009) (unpublished) ("the Complaint must go further than merely alleging with the benefit of hindsight that an impairment should have been taken to reflect a decline in fair market value.  Rather, the Complaint must provide detail as to why an impairment was required under then-existing accounting rules" (citations omitted)).  The parties' citation to *In re Ibis Tech. Sec. Litig.*, 422 F. Supp. 2d 294 (D. Mass. 2006), helps elucidate why Plaintiffs' allegations are insufficient here.  In that case, the plaintiffs claimed that the defendant corporation should have taken a write off on certain older inventory.  *Id.* at 314.  The plaintiffs supported their claims with specific factual allegations that 97% of the defendant's sales were from the newer product, compared to 13% in the same quarter the prior year and that, thereafter, the corporation stopped selling the older product entirely.  *Id.* at 315.  The court explained that "plaintiffs cannot plead a GAAP violation merely by claiming that a write-off for obsolete inventory that was taken in one quarter should have been taken in an earlier quarter."  *Id.* at 314.  By comparison, the Complaint in the instant case does not provide similar detail as to why an impairment was required to be reported prior to Detla's third quarter 2011 report.

Further, the Complaint does not describe the impairment testing Delta undertook nor does it explain how, or even if, Delta fraudulently reported the results of its impairment tests in its financial statements.  Instead, Plaintiffs rely on assorted arguments that appear unrelated to whether Delta's impairment testing was correct. For instance, Plaintiffs assert that the Opon deal had fallen through by June of 2010 and that, "[b]y this time[,] Defendants knew, or were reckless in not knowing, that [Delta] would be unable to obtain financing on acceptable terms such that it could go forward with development projects on its oil and gas properties."  (Doc. # 36 at 32.)  However, Plaintiffs also allege that, through the spring of 2011, "Delta was aggressively seeking investments . . . ."  (Doc. # 42 at 16.)  This indicates that, contrary to Plaintiffs' previous assertion, Delta was continuing to seek the capital necessary to proceed with its development projects.  Similarly, although Plaintiffs generally assert that Delta "had a liquidity issue[,]" "couldn't pay [its] bills (Doc. # 36 at 31 (quoting statements by Confidential Witness 1)), and was selectively paying vendors to conserve cash (*id.* at 32 (citing statements by Confidential Witness 2)), no specific facts are alleged and, in any event, Plaintiffs acknowledge that Delta was consistently "attempting to sell its assets." (Doc. # 42 at 16.)

Further, Plaintiffs assert that "[e]ach of the Company's Forms 10-K and 10-Q filings beginning with Delta's year ended 2008 Form 10-K, filed on March 2, 2009, carried a 'going concern' warning" (Doc. # 36 at 31) and that, by May of 2011, Delta's auditors told Defendants, and others at the company, that "bankruptcy [was] a real risk" (Doc. # 42 at 16 (quoting statements by Confidential Witness 1)).  But these assertions relate only to Delta's poor performance in general, not to the specific accounting

determinations that were made. *Cf., e.g.*, *Davidco Investors, LLC v. Anchor Glass Container Corp.*, No. 8:04-CV-2561T-24EAJ, 2006 WL 547989, at *3, 15-17 (M.D. Fla. Mar. 6, 2006) (unpublished) (plaintiffs sufficiently alleged facts indicating that defendant's failure to take earlier write-downs amounted to fraud, where, among other things, plaintiffs pled that defendant lost contract which accounted for 50% of production and, over the next year, no customers could be found to replace the lost sales). As such, the Court agrees with Defendants that Plaintiffs' "conclusory and nonspecific allegations are patently insufficient to demonstrate Delta failed to comply with GAAP concerning the timing of the impairment charge or that it overstated the value of any of its assets."[10] (Doc. # 40 at 18.)

According, the Court determines that Plaintiff has failed to state a claim for noncompliance with GAAP.

## IV. **CONTROL PERSON LIABILITY**

Because Plaintiffs have failed to state a claim for violation of Rule 10b-5, Plaintiffs' Section 20(a) claim for control person liability necessarily fails. *See Fleming*, 264 F.3d at 1270-71 ("[T]o state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person. Because we find that the district court properly dismissed Plaintiffs' claims relating to primary violations of the Act, we conclude that Plaintiffs' controlling person liability claims were properly dismissed, as well." (internal quotation marks and citations omitted)).

---

[10] Thus, the Court need not address whether Plaintiffs sufficiently alleged the additional elements of their claim regarding the accounting impairment.

## V.  <u>REQUEST TO AMEND</u>

In the last sentence of their response, Plaintiffs state that, "[s]hould the Court grant Defendants' Motion, Plaintiffs request leave to amend."  (Doc. # 42 at 30.) However, Plaintiffs have not filed a motion for leave to amend.  Under the Local Rules of this District, "[a] motion shall not be included in a response or reply to the original motion.  A motion shall be made in a separate paper."  D.C.COLO.LCivR 7.1(C). Likewise, Fed. R. Civ. P. 7(b)(1) requires that a "request for a court order must be made by motion."  Thus, there exists "no pending request to amend the complaint requiring the Court's attention."  *In re Level 3 Commc'ns, Inc. Sec. Litig.*, No. 09-cv-00200, 2010 WL 5129524, at *12 (D. Colo. Dec. 10, 2010) (unpublished) (citing *Calderon v. Kansas Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1186-87 (10th Cir. 1999) ("[A] request for leave to amend must give adequate notice to the district court and to the opposing party of the basis of the proposed amendment before the court is required to recognize that a motion for leave to amend is before it.")), *aff'd* 667 F.3d 1331 (10th Cir. 2012).

If Plaintiffs choose to file a motion requesting leave to amend, not only must they identify the new or additional facts that support their claims, but also, they shall address how the new information overcomes the Court's rulings in this Order.

## VI.  <u>CONCLUSION</u>

For the foregoing reasons, it is ORDERED that Defendants' Motion to Dismiss Plaintiffs' Consolidated Complaint (Doc. # 40) is GRANTED.  It is

FURTHER ORDERED that Defendants' unopposed Motion Requesting Judicial

Notice in Support of Motion to Dismiss Plaintiffs' Consolidated Complaint (Doc. # 41) is

GRANTED.

DATED:  September __30__, 2013

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge